# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Cheryl Ann Graf,                                    Civ. No. 11-3362 (DWF/JJK)

          Plaintiff,

v.

Michael J. Astrue, Commissioner        **REPORT AND**
of Social Security,                                    **RECOMMENDATION**

          Defendant.

_____

Gerald S. Weinrich, Esq., Weinrich Law Office, counsel for Plaintiff.

David W. Fuller, Esq., Assistant United States Attorney, counsel for Defendant.

_____

JEFFERY J. KEYES, United States Magistrate Judge

      Pursuant to 42 U.S.C. § 405(g), Plaintiff Cheryl Ann Graf seeks judicial

review of the final decision of the Commissioner of Social Security (the

"Commissioner"), who denied Plaintiff's application for disability insurance

benefits. The parties have filed cross-motions for summary judgment. (Doc.

Nos. 8, 10.) This matter has been referred to the undersigned for a Report and

Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For

the reasons stated below, this Court recommends that Plaintiff's motion be

denied and Defendant's motion be granted.

# BACKGROUND

## I.    Procedural History

Plaintiff protectively filed an application for disability insurance benefits on June 23, 2008, alleging a disability onset date of December 22, 2007.  (Tr. 292.) The Social Security Administration ("SSA") denied Plaintiff's claim initially on August 25, 2008 (Tr. 233), and upon reconsideration on December 3, 2008. (Tr. 228.)  Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ") on December 18, 2008.  (Tr. 244–45.)  The ALJ conducted a hearing, at which Plaintiff appeared and testified, on November 30, 2009. (Tr. 206.)  On July 27, 2010, the ALJ issued an unfavorable decision on Plaintiff's application.  (Tr. 192.)  Plaintiff filed a timely request for review on August 26, 2010 (Tr. 185), and the Appeals Council denied that request on September 20, 2011.  (Tr. 1.)  Denial of review made the ALJ's July 27, 2010 decision the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.981, 416.1481.

Plaintiff filed this action on November 16, 2011, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). (Doc. No. 1.)  On January 26, 2012, Defendant filed an answer and a certified copy of the administrative record.  (Doc. Nos. 6, 7.)  Pursuant to D. Minn. Loc. R. 7.2, the parties then cross-moved for summary judgment.  (Doc. Nos. 8, 10.)

## II.    Background

As of December 22, 2007, the date of Plaintiff's alleged onset of injury, Plaintiff was forty-six years old.  (Tr. 292.)  Plaintiff completed school through the eighth grade and had worked previously as a kitchen helper, housecleaner, and child daycare provider.  (Tr. 313, 318.)

Plaintiff visited the Mayo Clinic on April 16, 2007, for pain in her right elbow, and she was diagnosed with right lateral epicondylitis.[1]  (Tr. 447–48.) Plaintiff received an injection that day for the pain, and Dr. Keith A. Bengtson advised her that "she should continue to take care of the elbow[,] even though she might feel better after the injection."  (Tr. 423, 448.)  The injection reduced Plaintiff's pain for several weeks, but she reported being "back to square one" when she visited Dr. Bengtson again less than two months later.  (Tr. 446.)  On July 17, 2007, Plaintiff had x-rays of her elbow performed, which were negative. (Tr. 444–45.)  Dr. Joaquin Sanchez-Sotelo, a physician at the Mayo Clinic, administered another elbow injection to relieve her pain, recommended physical therapy, and told Plaintiff that she might consider surgical options if her elbow had not improved within several months.  (*Id.*)  Plaintiff reported on July 26, 2007, that the injection had relieved the pain.  (Tr. 457.)

---

[1]    Lateral epicondylitis is the medical term for tennis elbow.  *Tennis Elbow*, MayoClinic.com, http://www.mayoclinic.com/health/tennis-elbow/DS00469 (last visited September 21, 2012).  Although tennis elbow can result from poor backhand technique, other activities with repetitive wrist and arm motions can also cause the condition, which occurs when forearm tendons that attach to the bony prominence on the outside of the elbow become overworked and cause pain.  (*Id.*)

During a July 23, 2007 visit with Dr. Paul M. Huddleston, a physician at the Mayo Clinic, Plaintiff reported that she was "doing well" regarding chronic degenerative disc disease, working ten hours per day in daycare, and walking five miles per day, five times per week. (Tr. 442.) Because Plaintiff reported discomfort in her buttocks at nighttime, which resulted in loss of sleep, Dr. Huddleston advised her to reduce her walking to four miles per day, five days per week, and to cut back on her daycare work. (*Id.*)

Plaintiff saw Dr. Sanchez-Sotelo again on December 4, 2007, and reported that the pain in her elbow had returned. (Tr. 441.) After Dr. Sanchez-Sotelo discussed surgical treatment options and outcomes for the condition, Plaintiff indicated a preference for elbow surgery. (*Id.*) Plaintiff underwent right arthroscopic lateral tennis elbow release on January 7, 2008. (Tr. 422.) Several weeks after surgery, Dr. Michael Wolter, a physician at the Mayo Clinic, remarked that Plaintiff was doing "very well" and having "minimal discomfort." (Tr. 439.)

Plaintiff returned to the Mayo Clinic in March 2008 with complaints of neck pain radiating to her left arm and hand. (Tr. 437.) Plaintiff had been using Celebrex and Vicodin for lower back pain, and Dr. Paul M. Altrichter of the Mayo Clinic advised Plaintiff to continue this medication regimen and also prescribed Flexeril for muscle spasm. (Tr. 437–38.) Plaintiff returned to the Mayo Clinic several days later and received an injection to quiet the pain in her neck. (Tr. 436.) The injection provided only minimal relief. (Tr. 431.) During a

4

consultation in April, Plaintiff was also instructed to perform certain exercises at home.  (Tr. 462.)  On May 13, 2008, Plaintiff underwent neck surgery to decompress the spinal cord.  (Tr. 420–22, 454.)  Two weeks later, she reported doing very well, feeling "significantly better," and having "minimal complaints." (Tr. 427–28.)

In July 2008, Plaintiff returned to the Mayo Clinic and expressed concern that her neck collar, which she had been using since after her surgery, was becoming bothersome.  (Tr. 504.)  Plaintiff denied numbness, weakness, tingling, and neck pain.  (*Id.*)  Michelle L. Higgins, RN, CNP, of the Mayo Clinic, noted that Plaintiff had full, unrestricted cervical movement and that "[t]here [was] no pain to palpation over the cervical spine, thoracic spine, or sacroiliac joints."  (Tr. 504.) Dr. Huddleston, who also saw Plaintiff in July, noted that Plaintiff was "doing well" and had been off Celebrex, a pain medication, for three months.  (Tr. 503.)

Dr. Kirby Von Kessler, a state agency reviewing doctor, completed a physical residual functional capacity assessment on August 20, 2008.  (Tr. 484– 91.)  He opined that Plaintiff could (1) lift or carry up to twenty pounds occasionally and ten pounds frequently; (2) stand, walk, or sit for about six hours in an eight-hour workday; (3) never climb ladders, ropes, or scaffolds; (4) occasionally climb ramps or stairs, balance, stoop, kneel, crouch, crawl, or reach above shoulder level.  (Tr. 485–87.)  Dr. Von Kessler concluded that Plaintiff's conditions were severe but did not meet or equal any listing.  (Tr. 465.)

In December 2008, Dr. Cliff Phibbs, another state agency reviewing doctor, affirmed Dr. Von Kessler's assessment. (Tr. 506–08.)

During a September 2008 appointment with Dr. Sanchez-Sotelo, Plaintiff noted that she experienced right elbow pain after pulling weeds in June but confirmed that her pain had "substantially" improved since then. (Tr. 502). Dr. Sanchez-Sotelo advised Plaintiff to protect her elbow from aggressive pulling and lifting activities. (*Id.*)

Plaintiff reported discomfort in her left shoulder blade in October 2008, but the discomfort abated significantly with increased use of Celebrex. (Tr. 538.) Examination and testing yielded mostly normal results, and Plaintiff was not using walking aids and could stand without assistance at that time. (*Id.*) Two weeks later, Plaintiff complained of mid-thoracic spine tenderness and pain. (Tr. 537.) An MRI showed a small disc extrusion. (*Id.*) The extrusion was mildly deforming the left side of the thecal sac but was not producing any significant spinal canal narrowing or compressing the nerve root. (*Id.*) Plaintiff requested and received an epidural injection. (*Id.*)

At a follow-up visit on January 13, 2009, Plaintiff reported that her cervical spine was doing "quite well." (Tr. 535.) Because the mid-thoracic spinal injections only provided short-lived relief, Plaintiff was prescribed a new medication. (Tr. 535–36.) Plaintiff was also referred to pain management. (Tr. 533.) In addition, Dr. Huddleston noted that Plaintiff's symptoms were

"consistent with an early portion of resolution of a thoracic disc herniation." (Tr. 529.)

Dr. James Watson, a Mayo Clinic physician who conducted Plaintiff's pain clinic consult in March 2009, noted no evidence of a thoracic myelopathy[2] and encouraged Plaintiff to continue conservative pain management, although Plaintiff appeared to prefer a surgical solution. (Tr. 533.) Dr. Watson also found that Plaintiff's subjective complaints seemed to be out of proportion with her diagnoses. (*Id.*)

In April 2009, Plaintiff complained of pain in her left ankle after she stepped in a hole while running slowly with her grandson. (Tr. 542.) An examination showed moderate swelling and findings consistent with ankle sprain with osteocartilaginous loose bodies. (Tr. 541–42.) Plaintiff was instructed on the use of crutches and a walking boot to decrease weight-bearing on the ankle. (Tr. 544.) On May 8, 2009, Plaintiff had less pain and showed no swelling, deformity, or ecchymosis (i.e., a bruise)[3] of her ankle. (Tr. 547.) Timothy McLean, a physical therapist at the Mayo Clinic who evaluated Plaintiff, noted poor effort on examination. (*Id.*) When Plaintiff returned to the Mayo Clinic on

---

[2]    Myelopathy is "any disease of the spinal canal." *Thoracic Disc Disorder with Myelopathy*, MDGuidelines, http://www.mdguidelines.com/thoracic-disc-disorder-with-myelopathy (last visited Sept. 21, 2012). The adjective "thoracic" indicates that the myelopathy occurs in the middle region of the spine. *Id.*

[3]    *Ecchymosis*, Prime Health Channel, http://www.primehealthchannel.com/ecchymosis-definition-symptoms-causes-treatment-and-pictures.html (last visited Sept. 21, 2012).

May 29, 2009, for a recheck of her ankle, she reported that she was doing much better and was walking without the walking boot or crutches.  (Tr. 549.)

Because Plaintiff continued to experience thoracic pain in mid-2009, she elected to proceed with surgery, which she underwent on June 4, 2009.  (Tr. 546, 549, 550, 553–57, 573–76.)  Dr. Beth Ballinger of the Mayo Clinic performed a left thoracotomy and thoracic spine decompression at T8–T9.  (Tr. 557.)  At a follow-up appointment approximately one week after surgery, Gladys A. Radke, Certified Physician's Assistant, commented that she "ha[s] the feeling by listening to both Mr. and Mrs. Graf, that [Plaintiff] is probably lying around more than she is active as, compared to her activities when she was in [the] hospital."  (Tr. 559.)

During July 2009, Plaintiff was pain-free, felt "fantastic," and slept and ate better.  (Tr. 568–69.)  In August, Plaintiff told Dr. Huddleston that she was doing much better.  (Tr. 570.)  Dr. Huddleston noted that Plaintiff had some incisional soreness around the surgical site but no radiculopathy.[4]  (*Id.*)  He released Plaintiff from regular care when her examination was normal, including normal gait.  (*Id.*)  Dr. Anthony W. Roccisano, Doctor of Osteopathy at the Mayo Clinic, also saw Plaintiff that day and remarked that Plaintiff had a nonantalgic gate and was able to stand without assistance.  (Tr. 572.)

---

[4]     Radiculopathy is a condition caused by a compressed nerve in the spine. *Radiculopathy*, MedicineNet.com, http://www.medicinenet.com/radiculopathy/ article.htm (last visited Sept. 21, 2012).  It can cause pain, tingling, numbness, or weakness along the affected nerve.  *Id.*

Plaintiff visited Dr. Karen L. Newcomer, a Mayo Clinic physician, on December 11, 2009, about pain in her ankle. (Tr. 127.) Dr. Newcomer noted that Plaintiff's ankle pain was aggravated by walking and the elliptical machine. (*Id.*) She also observed that Plaintiff's gait was antalgic favoring the left side. (*Id.*) At a visit just five days later with Dr. Diane L. Dahm, a Mayo Clinic physician, about her ankle pain, Plaintiff was using a cane. (Tr. 125.) Dr. Dahm also remarked that Plaintiff "uses the elliptical machine for thirty minutes five times per week. This does hurt her ankle, but she continues to do it for her overall health." (Tr. 126.)

At a January 8, 2010 visit regarding Plaintiff's arthritis, Dr. Huddleston noted that –

> At this point, she has maintained an active lifestyle. Because of her arthritic discomfort in her hips, knees, ankles, and feet, she has not been able to walk or run. She has a health club membership and has had good success with the elliptical but is somewhat limited by what activities she can perform.

(Tr. 124.)

When Plaintiff visited David S. Nemgar, a physical therapist at the Mayo Clinic, regarding chest wall pain in January 2010, she reported going to the gym five times per week and using the elliptical. (Tr. 117.) Plaintiff received a physical therapy consult on January 18, 2010, for evaluation of left anterior chest wall pain, potentially related to incidental post-thoracotomy trauma. (Tr. 714.) There, Plaintiff reported she was active, visiting the gym five times per week and using the elliptical machine. (*Id.*)

On January 26, 2010, Dr. Ward Jankus conducted a consultative examination of Plaintiff. (Tr. 697–707.) Although Plaintiff used a wheeled walker in the office hallway, she was able to get into the exam room and maneuver around it "reasonably smoothly" without a walker. (Tr. 699.) Plaintiff reported that her previous surgeries had been successful in relieving nerve pressure but alleged residual mechanical back pain and muscular pain throughout her spine, especially at mid-back. (Tr. 697.) Plaintiff claimed that she spent the majority of her day in a semi-reclined or flat-lying position, spending only two to three hours of an eight-hour period on her feet. (Tr. 698.) Plaintiff's examination showed grossly normal spine alignment with some flattening of the cervical and lumbar lordoses, spinal tenderness, and normal architecture for her age in both the upper and lower extremities. (Tr. 699.) Plaintiff exhibited full range of motion of the upper extremities with discomfort at terminal overhead elevation and full range of motion at the hips, knees, and ankles. (*Id.*) Neurological examination of the upper and lower extremities was "essentially intact." (*Id.*)

Dr. Jankus opined that, in an eight-hour day, Plaintiff could stand or walk for two to three hours, sit upright for two to three hours, and recline or lie down for two to three hours. (Tr. 700.) He believed it was reasonable for Plaintiff to use a wheeled walker for longer distance community mobility and noted that Plaintiff benefited from using a cane for shorter distances. (*Id.*) Dr. Jankus also opined that Plaintiff would likely have difficulty with repetitive squatting, kneeling, and crawling and should avoid unprotected heights, use of ladders, and slippery

or uneven ground because of her spine issues. (*Id.*) He stated that Plaintiff could lift or carry five to ten pounds "for short distances" and not continually, and that her hands worked "okay subjectively and objectively" for light grasping and fine dexterity activities. (*Id.*)

On February 12, 2010, Plaintiff met with Dr. Watson, who remarked that Plaintiff's "typical precipitants for [back] pain are all day-to-day activities, excessive bending, twisting, lifting. By about 4 o'clock, this pain is very limiting to her. She has to simply go rest and put some heating pads on the regions." (Tr. 114.) Plaintiff's first physical therapy visit, with Mark A. Jensen, physical therapist at the Mayo Clinic, occurred on the same day, and Mr. Jensen noted that Plaintiff was tolerating using the elliptical machine five days per week "fairly well." (Tr. 113.) At Plaintiff's third physical therapy session on February 23, 2010, Mr. Jensen reported that Plaintiff "is having more pain today but [it is] likely the result of helping organize a closet a couple of days ago." (Tr. 111.)

Plaintiff saw Dr. Watson again on March 26, 2010. (Tr. 102–04.) Plaintiff reported that she continued to do well with her left side pain by using Lyrica and felt like she was "doing pretty well" overall. (Tr. 102.) Dr. Watson also remarked, "I am pleased with how she is doing as is she. She is really not so limited by her pain anymore and recognizes that she will always have some lingering issues there." (Tr. 103.)

Mr. McLean met with Plaintiff on October 14, 2010, for a physical therapy follow-up after her ankle surgery. (Tr. 78.) Mr. McLean noted that Plaintiff was

"doing well," could ambulate without her cane, and exhibited normal gait. (*Id.*)
When Plaintiff saw Dr. Dahm for another ankle re-check, Dr. Dahm noted that
Plaintiff "[o]verall . . . is doing well. She is much better when compared with prior
to surgery. She is back to walking and would like to begin using the elliptical."
(Tr. 64.)

Plaintiff met with Dr. Scott D. Pauley, Mayo Clinic physician, on January
26, 2011, after she noticed soreness in her left leg and ankle after walking on a
treadmill. (Tr. 49–50.) Dr. Pauley recommended, inter alia, that Plaintiff use her
cane for support and consider using the ankle brace or walker she used after her
ankle operation. (Tr. 51.)

### III.  Testimony at Administrative Hearing

Plaintiff, represented by counsel, testified before the ALJ on November 30,
2009. (Tr. 208–21.) She stated that her activities included driving, taking her
grandson to and from school every day, using an elliptical exercise machine,
visiting family "once in a while" in Medford,[5] shopping for groceries, and attending
church. (Tr. 210–11, 215–16, 218–19.) In previously completed function reports,
both Plaintiff and her husband indicated that Plaintiff also did light housework and
cleaning (including dusting and sweeping), made the beds, did laundry, did

---

[5]     Defendant refers to this community as Medford, Minnesota, a town
approximately 50 miles from Plaintiff's home in Rochester. (Def. Mem. Supp.
Mot. Summ. J. 6.) A town called Medford also exists in Wisconsin, and this
Medford is approximately 170 miles northeast of Rochester. This Court found no
evidence in the record to indicate which of these communities Plaintiff was
referring to at the ALJ hearing. (Tr. 216.)

"simple repairs," watched their child, prepared meals, watched television, walked, drove, shopped, attended baseball games, and went to church. (Tr. 334–38, 345–49.) Plaintiff, who appeared at the hearing using a walker, testified that she needed to use her walker every day. (Tr. 213.) When the ALJ questioned why she still needed a walker despite a doctor telling her in June that she would need the walker for only a couple months, Plaintiff said that she used the walker "[b]ecause [her] back pain is everyday." (*Id.*) Plaintiff also testified that she was unable to sleep without medication because of the pain. (Tr. 214.) And although Plaintiff had previously volunteered at a school, she had to quit because of her back pain. (Tr. 217–18.)

A vocational expert also testified at the ALJ hearing. (Tr. 221–24.) The ALJ asked the expert whether jobs existed that someone with Plaintiff's vocational profile could perform if limited to sedentary work; no ropes, ladders, or scaffolds; and occasional balancing, stooping, kneeling, crouching, crawling, and reaching above shoulder level. (Tr. 221–22.) The expert testified that Plaintiff's past work would not be possible but that such a person could perform jobs such as optical assembler (1,500 to 2,000 in-state jobs), semi-conductor bonder (5,000 in-state jobs), and security monitor (1,000 in-state jobs). (Tr. 222–23.)

## IV.   The ALJ's Findings and Decision

The ALJ issued a decision on July 27, 2010. (Tr. 192–205.) He found that Plaintiff had the following severe impairments:

> [D]egenerative disc disease of the lumbar spine, status post anterior lumbar fusion and arthrodesis; right lateral epicondylitis release; degenerative disc disease of the cervical spine, status post C7 corpectomy with interbody graft and plates from C6–T1; and thoracic radiculopathy and degenerative disc disease, status post discectomy and fusion.

(Tr. 194.) The ALJ determined that Plaintiff's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. (Tr. 195.) He found that Plaintiff retained the capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) – lifting and carrying ten pounds occasionally and five pounds frequently, standing or walking two hours out of an eight-hour day, and sitting six hours of an eight-hour day. (*Id.*) The ALJ also limited Plaintiff to crawling, crouching, stooping, and reaching above shoulder level only occasionally. (*Id.*) Additionally, Plaintiff was to avoid climbing ropes or ladders. (*Id.*) Based on Plaintiff's age, education, residual functional capacity, and vocational background, the ALJ concluded that a significant number of jobs in the national economy existed that Plaintiff could perform and that, therefore, she was not disabled. (Tr. 200–01.)

## DISCUSSION

### I. Standard of Review

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006). "There

is a notable difference between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Reed v. Sullivan*, 988 F.2d 812, 814 (8th Cir. 1993) (internal quotation marks omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001) (quoting *Beckely v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis."  *Gavin*, 811 F.2d at 1199. "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."  *Id.*  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

In reviewing the record for substantial evidence, the Court may not substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision merely because evidence may exist to support the opposite conclusion.  *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (concluding that the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a

particular finding from being supported by substantial evidence.  *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second, that other work exists in substantial numbers in the national economy that the claimant is able to do." *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.     Analysis

### A.     Plaintiff's Credibility

Plaintiff argues the ALJ erred by discounting Plaintiff's description of her pain symptoms and their impact on her functioning.  (Pl.'s Mem. 8.)  Although the ALJ conceded that Plaintiff's spinal conditions could produce the symptoms she described (Tr. 195), Plaintiff contends the ALJ erred because he did not detail Plaintiff's specific activities that directly conflict with her descriptions of pain and its resulting restrictions.  (Pl.'s Mem. 11.)  Plaintiff argues that the record reflects Plaintiff's long-standing efforts to treat her pain through medication and by avoiding or minimizing activities that aggravate it and that the record does not suggest Plaintiff was exaggerating her complaints or "is a malingerer."  (*Id.* at 10–

11.)  Plaintiff also asserts that all her physicians have taken Plaintiff's pain reports seriously.  (*Id.* at 10.)

Defendant argues that the record as a whole supports the ALJ's decision regarding Plaintiff's credibility.  (Def.'s Mem. 10.)  In support of this position, Defendant points to entries in the record that show improvement in Plaintiff's symptoms with medication and treatment, and to specific activities that the ALJ referenced in his report.  (*Id.* at 11–12.).  Defendant also notes the report of a treating physician who observed that Plaintiff's complaints seemed "out of proportion" to her diagnoses, and other reports in the record describing Plaintiff's daily activities as less limited than she claimed.  (*Id.* at 12–13.)

Plaintiff's claim centers on the ALJ's treatment of her subjective pain reports.  In evaluating pain reports, the ALJ –

> must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency, and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness, and side effects of medication;
> 5. functional restrictions.

*Polaksi v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  "Complaints that are inconsistent with the evidence as a whole, including medical reports and daily activities, may be discredited by the ALJ."  *Clark v. Chater*, 75 F.3d 414, 417 (8th Cir. 1996).  "The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's

17

complaints." *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)). Although the ALJ must consider each *Polaski* factor, she need not discuss in her decision how each factor relates to the claimant's credibility. *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [the Court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Baldwin v. Barnhart*, 349 F.3d 549, 558 (8th Cir. 2003) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987)).

In accordance with *Polaski*, and contrary to Plaintiff's assertion, the ALJ did give full consideration to all the evidence presented regarding Plaintiff's complaints of pain. The ALJ's report provided more than mere lip service to *Polaski* – consideration of the relevant evidence fills almost four full pages. (Tr. 195–99.) The ALJ noted specific instances in the record where Plaintiff's activities after her alleged disability onset date appeared contrary to her complaints of disabling pain. For example, in June 2008, Plaintiff felt well enough to pull weeds in her garden for "quite some time" before her elbow began hurting. (Tr. 197, 502.) When she met with Dr. Sanchez-Sotelo in September about her elbow, Plaintiff's pain had substantially improved, and her elbow showed full range of motion and grossly intact neurovascular status. (*Id.*)

18

Plaintiff was also well enough in April 2009 to run slowly after her grandson. (Tr. 198, 614.)  Although Plaintiff sustained an ankle injury from this activity, a check of the ankle in May 2009 revealed no swelling, deformity, or ecchymosis. (Tr. 198, 609.)  The ALJ also cited a January 2010 physical therapy visit where Plaintiff reported visiting the gym five times per week and using the elliptical machine.  (Tr. 199, 714.)  Additionally, the ALJ noted that, although Plaintiff had retired from her previous work as a daycare provider, she still took care of her six-year-old son and completed household chores.  (Tr. 199.)

In addition to considering incongruent facts in the record, the ALJ's report also notes instances where doctors appraised Plaintiff's pain as disproportionate to her diagnoses.  (Tr. 197–98.)  The ALJ explained that Dr. James Watson, a physician Plaintiff saw in March 2009 for pain management, observed that Plaintiff's pain seemed out of proportion to what could be explained by the diagnoses of thoracic disc or radiculopathy that Plaintiff had received.  (Tr. 197–98, 533).  Additionally, Plaintiff's physical therapist remarked on Plaintiff's poor effort at a May 2009 visit concerning Plaintiff's ankle.  (Tr. 547; 198.)

While noting that the record contained instances where Plaintiff sought medical attention for elbow, neck, back, and ankle pain (Tr. 196–99), the ALJ also referred numerous times to the success Plaintiff had in relieving such pain through the use of surgery and medication.  (*Id.*)  Just two weeks after a May 2008 neck surgery, Plaintiff was doing "very well" with minimal complaints." (Tr. 196, 427.)  Plaintiff's discomfort in her left shoulder blade in October 2008

19

improved significantly with an increase in pain medication. (Tr. 197, 624.) An epidural injection alleviated thoracic spine pain Plaintiff experienced in October 2008, and Plaintiff reported that she was doing "quite well from a cervical spine standpoint" in January 2009. (Tr. 197, 622, 624.) In June 2009, Plaintiff underwent thoracotomy, complete discectomy at T8-9, anterior decompression with allografting, fusion, and interspinal fixation. (Tr. 198, 557.) Despite an infection at the surgical site that delayed Plaintiff's recovery somewhat, Plaintiff later reported feeling "fantastic," eating and sleeping better, and having no need for pain medication. (Tr. 198, 568.) And in August 2009, Plaintiff was released from primary care to a one-year check. (Tr. 198, 570.)

The ALJ thoroughly discussed the reasons for finding Plaintiff's subjective complaints of pain implausible and used the *Polaski* factors as the basis for this evaluation. As such, this Court concludes that the ALJ properly assessed the evidence and that the ALJ's assessment of Plaintiff's credibility is supported by substantial evidence in the record as a whole.

### B.     Treatment of Consulting Examiner's Assessment

Plaintiff also argues that the ALJ erred by not placing controlling weight on the report made by Dr. Jankus, whom the ALJ himself appointed as a consulting examiner. (Pl.'s Mem. 11.) Plaintiff contends that Dr. Jankus' observations are not inconsistent with the record as a whole, as his observations are consistent with Plaintiff's medical history and his assessment was based on an independent

review of Plaintiff's medical history and his own interview and examination of her. (Pl.'s Mem. 13.)

Defendant contends that the ALJ reasonably considered Dr. Jankus' report and decided to give it less weight because it was not well-supported by the record. (Def.'s Mem. 14.) Defendant points out that Dr. Jankus' conclusions regarding Plaintiff's limitations are not supported elsewhere in the objective record and that Dr. Jankus' opinion was inconsistent with Plaintiff's ability to perform certain activities. (*Id.*)

In short, the parties disagree as to whether the ALJ erred in giving Dr. Jankus' report less weight than the reports of other medical practitioners. "[T]he ALJ may reject the conclusions of any medical expert, whether hired by a claimant or by the government, if inconsistent with the medical record as a whole." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). The fact that the ALJ ordered an examination does not affect how the ALJ evaluates the examiner's report. *See id.*; *Pierce v. Apfel*, 173 F.3d 704, 707 (8th Cir. 1999) (stating *Bentley*'s proposition with approval). Courts reviewing an ALJ's decision "will disturb [that] decision only if it falls outside the available 'zone of choice.'" *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). But "[a] decision is not outside that 'zone of choice' simply because [the court] may have reached a different decision had [it] been the fact finder in the first instance." *Id.*

The ALJ discounted the opinion of the consulting examiner because statements within his opinion had no support within the objective record and

Plaintiff's recent examinations showed few problems with walking and mostly normal test results. (Tr. 199.) Aside from Dr. Jankus, no medical source said that Plaintiff needed to use a walker in the long term or to lie down for significant periods of time. The ALJ reviewed at length the results of Plaintiff's August 2009 examination by Dr. Anthony W. Roccisano, noting "non-antalgic gait[6] and normal heel, toe and tandem gait." (Tr. 199, 572) Plaintiff also presented:

> normal alignment of the spine, full, unrestricted range of motion of the cervical and lumbar spines, full, painless range of motion of the upper and lower extremities, negative straight leg raise, 5/5 motor strength in the upper and lower extremities, intact sensation to light touch and pain perception, and stable reflexes and pulses.

(*Id.*) In a consultation with Plaintiff on the same day, Dr. Huddleston remarked that Plaintiff was "doing much better." (Tr. 570.) The ALJ also noted that Plaintiff's overall functioning was inconsistent with disability, citing Plaintiff's ability to care for her son, perform household chores, and visit the gym five times per week. (Tr. 199.) In addition, the ALJ expressly gave consideration to the non-examining opinions of state examiners as reasonable based on the record. (*Id.*)

     In his report, the ALJ reasonably determined that Dr. Jankus' report was not supported by the objective record, based on assessments of other physicians and Plaintiff's activities. The ALJ's decision not to place controlling weight on

---

[6]    Antalgic gate occurs when a person attempts to avoid putting weight on one leg because of pain. Dr. Michael Nirenberg, *Antalgic Gate*, FootAnkleHealth.com, http://www.footanklehealth.com/health/antalgic-gait.html (last visited Sept. 21, 2012).

Dr. Jankus' examination is clearly within the "zone of choice" and, as such, should be affirmed.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 8), be **DENIED**;

2. Defendant's Motion for Summary Judgment (Doc. No. 10), be **GRANTED**; and

3. This case be **DISMISSED WITH PREJUDICE**, and judgment be entered accordingly.

Date:  October 3, 2012          __*s/ Jeffrey J. Keyes*_____
                                                JEFFREY J. KEYES
                                                United States Magistrate Judge

Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **October 17, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.